v. Food and Drug Administration, et al. Mr. Sammons for the appellants, Ms. Dixon for the appellants. Mr. Sammons, good morning. Before you start, we've had some difficulties with our connections. Judge Wilkins can hear, but we can't get him on the video, but it looked like we did for just a second. So if you would proceed with your argument. Thank you, Your Honor, and may it please the court. I'm David Salmons on behalf of MediNatura. This appeal from the denial of a preliminary injunction concerns FDA's recent dramatic change in policy governing the importation and marketing of homeopathic drugs. Before turning specifically to the court's question about the Cook case, I'd like to focus for a short moment on the nature of this policy change, which I think helps answer the court's question. For decades, CPG 400-400 made clear that homeopathic drugs that reflected recognized or customary homeopathic practices and complied with manufacturing and labeling requirements specified in the guidance may be marketed in the U.S. without first going through a new drug application process. Remember that applications are only required for new drugs, which are defined by statute as ones not generally recognized as safe and effective by qualified experts, sometimes referred to as the GRAS-E standard. Remember also that FDA's position for decades was that its existing GRAS-E protocols were developed for pharmaceutical drugs and were poorly suited for the uniqueness of homeopathic medicine. So FDA indicated it would eventually develop a homeopathic-specific protocol for determining new drug status. In the meantime, 400-400 effectively treated homeopathic drugs that complied with its standards as if they were not new drugs but were instead at least potentially generally accepted as safe and effective. Now, through its withdrawal of 400-400 and its import alert, FDA seeks not only to impose the existing GRAS-E process on traditional homeopathic drugs for the first time, but to suddenly declare unsafe and block from importation any homeopathic drug that cannot show it has already gone through the approval process that FDA until recently declared was neither required nor appropriate for these products. So I understand your point about requiring tests that take time to perform, but I want to be clear. You're not saying, are you, that FDA couldn't change the standards and require a new drug application, are you, for these homeopathic drugs? Assuming that the FDA follows the normal APA process and comes to a conclusion that's supportable, of course, it has the authority to do that. Okay. So the only concern, as I understand it, you have, or the main concern, is that the alert was final agency action. Well, that is certainly one of the grounds on which we're seeking review. The other is that the withdrawal of 400-400, the district court below concluded it was final agency action as well and that the prior policy had given rise to legitimate reliance interests under the Supreme Court's decision in Regents. But then the court erroneously concluded, in our view, that the FDA had, although cursorily in the court's view, adequately analyzed whether there were reliance interests, whether they were substantial, and properly weighed them against the reliance interests at issue. And we think the court there was fundamentally wrong that what, by the reasoning of the district court itself, FDA made legal errors at each one of those steps. It determined that there were no legitimate reliance interests, that there was no possibility of legitimate reliance interests because it characterized its prior policy in an inappropriate and inaccurate way. And therefore, it never determined that there was a substantial reliance interest and it didn't meaningfully weigh them against the agency's stated reasons. The agency merely declared these are our reasons and they justify our action. That's the case. An agency has to do that in any challenge to satisfy the APA's arbitrary conclusion. Counsel, I'd really like for you to get to the issue of Cook and the letter that's at supplemental appendix 53, the letter of February 19th from Ms. Begley. I'm sorry, to Ms. Begley from the FDA and specifically redressability. Certainly, Your Honor. So with regard to Cook, I think a few things. Let me just say this, just to make clear what the concern is that I think that I have, which is that there's a final agency action here now that says that it has found these injectable homeopathic drug products to be not generally recognized as safe and effective under the Food, Drug, and Cosmetic Act. Now that that finding has been made, doesn't Cook say stand for the proposition that the agency is bound by it and that regardless of whether we were to say that the import alert and the withdrawal of the guidance were error, you can't get around this finding and the mandatory language of the statute. So you're still not going to be able to import these drugs. So that's what I want you to deal with specifically, please. Yes, Your Honor. I'm very happy to. And I have several points to make with regard to that. The first is that I think the one thing that I think you could take away from the Cook case is that it is clear, as we've argued all along, that the issuance of the import alert itself that declares that it appears our products are unapproved new drugs was final agency action. The government's argument against that all along has been that it's merely an advisory statement and that the local field office staff can decide whether or not to follow it. And I think all the authorities we cited for that proposition already defeated that view, but Cook destroys it. Cook makes clear that once the agency has made a determination that it appears that there is an unapproved drug or some other drug that's not admissible, that it's mandatory to block it. And so that just underscores our view that from the very beginning, the import alert was final agency action. With regard to Article 3, I don't think Cook is relevant, Your Honor. Of course, it itself is not an Article 3 case. It concluded that certain enforcement discretion that was claimed by the agency in that case was not, in fact, committed to agency discretion by law, but in fact was mandated by the statute. But in that case, the agency was attempting to write on a blank slate in the terms of regents. That case was about an agency's failure to take actions required by the statute. In this case, we're not writing on a blank slate. There's longstanding policy that treated our products as if they were not new drugs and that authorized them. It was an affirmative grant of the ability to market in the United States. It wasn't even just a deference of enforcement authority, much like the DACA memo in the regents' case. I guess what I'm trying to get at, counsel, is that I understand Cook wasn't a standing case. It seems to me that Cook has significant ramifications as to whether there is redressability. Let's suppose for a moment that we completely vacate the import alert and we tell the agency that it has to reinstate the former guidance. You still are stuck with this letter at SA 53. And I don't see, given that and the finding of the agency that these don't meet the Grasse standard, how you would be redressed at all. Can you explain that, please? Yes, absolutely, Your Honor. So, first of all, if the agency is required, as we think they should be, to reinstate the policy of 400-400, at least until they have demonstrated an appropriate consideration of the reliance interests engendered by their product, I don't think there's any plausible argument. I know the court below concluded this, but I think it's just clearly wrong that the agency would continue to be able to detain Meta Natura's products or exclude Meta Natura's products. And you don't have to take my word for the fact that this enforcement priority that was reflected in the import alert is inconsistent with the policy that was established in 400-400. The agency itself declared that when it suddenly withdrew that policy after having promised initially to leave it in place until it was formally replaced with a new guidance. The agency, as you recall, in 2018… That was before the agency issued a finding that these drugs are not generally recognized as safe and effective. And if the statute is to be construed as the court did in Cook, then the FDA has no choice but to bar future importation of these drugs. Yeah, I think that's where I think Your Honor is mistaken with regard to the implication of Cook. And I think the important thing is you have to reconcile what, however you may be reading Cook, with what the Supreme Court said in Regents, for example. The Supreme Court in Regents was very clear that it was beside the point for purposes of reliance, interest, and remedy whether or not the prior policy was lawful. You know, the primary reason it was withdrawn, the stated reason by the acting Attorney General, was that it was an unlawful policy. The dissent in Regents made the point that, in fact, from Justice Thomas' dissent, so long as the agency's determination of illegality is sound, our review should be at an end. But the Supreme Court majority rejected that and said it's beside the point whether it was, in fact, lawful policy or not. And I'll just read this part from the opinion, Your Honor. It says that the dissent is correct that DACA was rescinded because of the Attorney General's illegality determination. But nothing about that determination foreclosed or even addressed the options of retaining forbearance or accommodating particular reliance interest. The acting director should have considered those matters but did not, and that failure was arbitrary and capricious in violation of the APA. So the fact that either before or now they think that our products are illegal does not determine whether we are entitled to have reliance interest considered and whether or not it was arbitrary and capricious on the part of the agency to refuse to consider it. I think that to the extent you're reading Cook, and I'm not even sure Cook supports that proposition, it's true that the agency Let me ask you this with respect to Cook, and I'll wait to hear Ms. Dixon's interpretation. But I find Cook irrelevant because it has to do with an unregistered establishment, and you all are registered, and the language from Judge Ginsburg about or otherwise is plainly dicta. Well, I think that is correct, Your Honor. I think also, you know, it's very clear if you read the holding in Cook. It said, you know, our reading of 381 does not require the FDA to inspect 21 million articles, only those that it's obligated to do so because they were manufactured in an unregistered facility. All of our products were manufactured in a registered facility. This is part of the framework of 400-400. All of our products were registered, or excuse me, were manufactured in registered facilities, and the FDA routinely inspected those facilities to ensure compliance with those guidelines. Fundamentally, what we have here is a policy change on the part of the agency that said previously, because of their unique nature, and because we have not yet developed a formal GRAS-E determination process that is suited to homeopathic drugs, we have adopted this policy guidance that makes clear that if it's part of the ordinary and customary homeopathic practice, and you comply with the manufacturing requirements set out here and the labeling requirements, but there's no dispute, Manitoura did all of that, then you may market in the United States, and it's the import alert itself, not even the actions that followed, that for the first time and finally imposed the obligation on homeopathic drugs to satisfy the agency's current GRAS-E standards in order to import their drugs. It's the withdrawal of 400-400, and it's the imposition of the import alert that has that effect. And even if you put aside that dramatic policy change, the import alert itself seized Manitoura's products. It itself was a final agency action. Even if it's the case that additional agency actions that may be final and challengeable have occurred, that doesn't change the fact that the fundamental policy was finally determined at the time the import alert was issued with regard to that. And I would point the court to cases like Safari Club and Hawks and others that make clear that even where there's some agency action that may continue, and even where it's possible the agency might ultimately change its mind, when you have an action that fundamentally affects rights, as this action did, it changed the status of our products. All right, Mr. Sammons, we have your argument. You're way over your time. We'll give you some time and reply. And let's hear from Ms. Dixon now. Good morning, and may it please the court, Courtney Dixon for the government. I'll start with this question about Cook. Judge Henderson, we agree with you that Cook is not relevant here because, as your Honor noted, Cook dealt with the agency's obligations when it's sampling from unregistered facilities. This is a registered facility. Cook was clear in its opinion that it wasn't, as it stated, exploring all the, quote, oases of discretion that the agency might otherwise have, and we don't think the court needs to certainly weigh in on any of those questions here. Cook is doubly irrelevant here, I would say, as well, because Cook dealt with, in the unregistered facility context, the agency's obligation at the end, after it had made a final determination that the drug was unlawful, whether it needed to refuse admission or whether it might have discretion. Here, after the agency finished its process and made the final determination that meditators drugs are not generally recognized as safe and effective, the agency issued refusal notices. And so the court's not confronted here with the question of what discretion FDA may have, and I don't think, again, that the court should address that, given that, again, Cook itself was careful not to wade into these questions that weren't presented there. That said, Judge Wilkins, I do agree with perhaps maybe the instinct behind your question, which is that there is a mismatch here between what plaintiff is seeking in its preliminary injunction and the irreparable harm that it's alleging here. And we think that mismatch existed even as plaintiffs before the agency had reached a final decision, because plaintiffs are challenging an import alert, which is an advisory notice to FDA field staff about this interlocutory decision about determining which drugs to detain. And of course, detention is the beginning of the administrative process and not the end. The agency has now completed that process. It's made a determination as to plaintiff's drugs. And the proper path forward is for plaintiff to amend its complaint to put those final decisions before the district court where the full administrative record underlying the agency's decision can be produced. And plaintiffs can challenge the agency's determination that its drugs are not generally recognized as safe and effective. We think that's the reason that plaintiffs aren't entitled to a preliminary injunction, maybe not an issue of standing, given that at the time that plaintiffs filed their complaint, you know, they had standing. But certainly, as we explained in our brief, both with respect to the guidance and with respect to the import alert, you know, to the extent that plaintiffs are claiming that they're irreparably harmed because they can't presently market and sell their drugs, a preliminary injunction merely directed to the import alert or the withdrawal of FDA's guidance isn't going to allow plaintiff to immediately begin, you know, selling and marketing its drugs as it would like. Again, plaintiff should amend its complaint, which it has not done. It won't allow them to vacating the preliminary injunction won't have an effect because why? So, Your Honor, I mean, the import alert, as I noted, it's an advisory instruction to field staff about this interlocutory determination of which drugs do we detain pending administrative review. The agency has now reached a final decision. So, adding and removing plaintiff's drugs to the import alert, you know, that could have an effect maybe that would, if plaintiff's drugs were on the import alert, you know, that's a mechanism that FDA uses to communicate with its field staff. So, arguably a future shipment of plaintiff's product, plaintiff's drugs wasn't on the import alert, it might increase the likelihood that a drug could fall through the cracks in the future. But again, that's so maybe that Article 3 standing could be satisfied, but in terms of the legal status of plaintiff's drugs and FDA's determination, the import alert, removing its products from the import alert isn't going to change that. Nor will it change the fact that FDA has now made final decisions about plaintiff's products here and that FDA can continue to detain future shipments of plaintiff's products and could continue to refuse admission to those products. Again, because the import alert is guidance to FDA field staff about this preliminary decision about which drugs to detain. It's not a final determination about the legal status of plaintiff's drugs. Because again, the import alert is preliminary even to a decision whether to detain the drugs and the detention is the start of the administrative process and not the end. With respect to the guidance, Your Honor, as the district court noted, the agency evaluated reliance interests. It explained that it had reason to withdraw its outdated 30-year-old guidance, which no longer reflected the agency's current enforcement priorities in light of recent significant safety concerns and the tremendous growth of the homeopathic drug industry in the last several decades. The agency explicitly acknowledged reliance interests. Again, it explained why those were outweighed. Plaintiff's don't dispute, of course, that the agency can change its mind about an enforcement policy that it had in place. The agency explained its reasons for doing so. Those reasons were well stated. They were well reasoned and certainly satisfy the APA here. So in a hypothetical situation, much as is argued here, this person's drugs were safe so far as anyone knew. They were part of a class, but there was no evidence of danger to human health. That, I gather, is not a requirement when an alert is put on, even though an alert basically can shut down your business. Is that right? So it's not a requirement that the drug be found to be particularly dangerous? Is that your Honor's question? So it doesn't matter? Even if a class of drugs is generally dangerous, but a particular supplier has a drug that is not dangerous, can he be swept up? So, Your Honor, I guess there's a few ways of answering that question. Maybe the first being, you know, the import alert at issue here, there's a lot of different import alerts. The specific import alert at issue here, 6641, is drugs that are suspected of being unapproved new drugs. Well, we know it's unapproved, all right, in the sense it's not a new drug. But is there any evidence that it's dangerous? That's what I'm trying to understand, since that seems to be the standard. The drug doesn't have to be, sorry, we know that FDA has not approved plaintiff's drug, but a drug doesn't require FDA approval if it's generally recognized as safe and effective among experts qualified to recognize the safety and efficacy of drugs. So was there evidence here that the plaintiff's drugs were not safe? I just want to be clear. So the FDA has, pursuant to its risk-based approach to enforcement that it's put in place, it has proceeded to enforce the FDCA's requirements against homeopathic drugs that fall into particularly risky categories. Is this a particularly risky category? Yes, Your Honor, because plaintiff's drugs are injectable, which means they're injected directly into the bloodstream and potentially bypass some of the body's natural defenses. And because of the ingredients that they are labeled to contain, here are potentially toxic ingredients. So particularly when you have that combination, potentially toxic ingredients injected directly into the bloodstream, it does present a heightened risk. And of course, FDA added plaintiff's drugs to the import alert only when it had enough evidence to have a suspicion that, hey, these drugs, we can justify detention, and that starts the administrative process. In the administrative process, plaintiffs had the opportunity and did submit evidence to try and say, hey, our drugs are generally recognized as safe and effective among experts qualified to recognize the safety and efficacy of drugs, and that they're not new drugs. Of course, the FDA has now disagreed with that, and plaintiffs may disagree with that conclusion. But again, the proper course is for plaintiff to amend their complaints, to put FDA's final decision before the district court. The full administrative record can be introduced. So all of the evidence and arguments that plaintiff presented, the evidence and arguments plaintiff, or sorry, the FDA relied on, all of that can be put before the district court. And again, now that FDA has reached its final decision, that's the most appropriate path forward, rather than seeking a preliminary injunction against this preliminary advisory import alert, and then FDA's withdrawal of its guidance. Let me direct your attention to the guidance. The close issue that I see is the reliance issue, interest, and the notice in the Federal Register doesn't even mention it. And it's a pretty weighty consideration after the amount of time the guidance has been in effect. What is your best authority for answering the reliance interests coming from this citizen's petition, from a different document? Sure. So, first, you know, the agency first announced in 2015 that it was reconsidering its guidance, and it solicited public input at that time. The agency received public input and as part of, you know, this all this consideration of its guidance, it received a citizen petition from the Americans for Homeopathic Choice that said, hey, don't rescind your guidance. In fact, you should make some, they had suggested, as they called it, modifications, but the agency said they were quite drastic changes. But the Americans for Homeopathic Choice wanted the agency to make these modifications and then codify its guidance as a regulation. And the agency, again, in the course of making this decision about its guidance, it responded to the citizen petition and said, no, we're not going to maintain our guidance. We, in fact, are going to withdraw the guidance at this time. And the agency acknowledged that the citizen's petition had explicitly invoked the longstanding nature of the guidance and reliance interests. And the agency said, you know, you've asserted these reliance interests, both on behalf of industry professionals and consumers. But the fact that the agency has determined that this guidance no longer reflects its current priorities because the homeopathic drug industry has grown significantly to a billion dollar industry, which has led to an increased consumer exposures to these drugs. And that has come with a corresponding increase in safety concerns, some of which are quite significant, including infant deaths and seizures. And in the case of one homeopathic cold medicine, loss of the sense of smell. The agency recognized that its prior guidance didn't reflect its current thinking, and it wanted to move towards a more specified risk-based approach to enforcement. And so it said the agency's interest in withdrawing, again, this outdated guidance document that didn't reflect current facts before the agency didn't, or sorry, those, the FDA's interest in doing so in the interest of public health outweighed the asserted reliance interests. And with respect to the Federal Register Notice, the agency essentially said all of those same reasons in the Federal Register Notice the next day. It didn't explicitly say the words reliance interests in that Federal Register Notice. But again, the same underlying points were there. And the agency, again, had responded to those reliance interests specifically where they had been invoked in the citizen petition response. Is it basically your argument that the FDA's announcement that it was going to a risk-based approach answers the reliance interests? I would say that the agency answered the reliance interests at the time it made its decision, and that's set forth in the citizen petition. The Federal Register Notice the next day states essentially the same thing, but doesn't explicitly invoke reliance interests. But I think that that's also, again, the same reasoning is set forth there. And plaintiffs suggest that, you know, looking at the citizen petition response, even though the words reliance interests weren't specifically included in the Federal Register Notice, is, you know, similar to a post hoc rationalization of government counsel. But the concern there is that when the agency hasn't had any discussion about something, you don't want to, you know, take my word for it and speculate about what the agency might have been thinking. I mean, here, that's certainly not the case. We know what the agency was thinking at the time. It said it explicitly in its citizen petition response, which was a day before it published the Federal Register Notice. And again, these are the words of the agency articulated at the time. So you don't have to take the words of government counsel or potentially speculate about what the agency was thinking. We know what the agency was thinking, and it set forth its reasonings clearly in the context of considering this exact question, whether it should withdraw or maintain its guidance. All right. Do my colleagues have any questions of Ms. Dixon? All right. Mr. Sammons, why don't you take a couple, take two minutes. Thank you, Your Honor. I'll try to be very brief. I have just three quick points. The first with regard to the import alert and the characterization that it's only advisory and doesn't have any meaningful effects. I refer the court to the Balerno and the Smoking Everywhere cases and to the court case itself, which makes clear that that's simply not true. The import alert expressly says that it's not subject to normal discretion judgments by the local staff, and it's not merely advisory. With regard to the causal connection between the withdrawal of 400-400 and the issuance of the import alert and all that's followed, and to the extent that has any connection here with the remedy we're entitled to, I think it is clear on this record that the agency itself said we cannot pursue our new enforcement priorities while 400-400 is in place, which is the very reason it gave for why it had to withdraw it immediately, and then it, of course, immediately follows up with the import alert. The saying now that those two things have no connection to one another is not plausible. If that policy is reinstated, the import alert goes down. There's no other way around it. The only basis for it was that we hadn't complied with the GRAS E determination for pharmaceutical drugs, which, of course, 400-400 says we don't have to do. We can't have it both ways, Your Honor. If the two things are unconnected, then they have not considered reliance interest with regard to the import alert. They need the two to be connected because the only discussion of reliance interest is in the citizen petition that they claim is connected sufficiently to the withdrawal of 400-400. So they can't have it both ways. These two things are connected, and if we win that 400-400 has to be reinstated, then that gives us the relief we need. And then with regard to reliance, I think the Regents' case is exactly on point here. What the agency says they did, what the Supreme Court required is that they assess whether there were reliance interest, determine whether they were significant, and weigh any such interest against competing policy. You look at the language that the government points to, and throughout this litigation, it's taken the position that there are no legitimate reliance interest. So, therefore, there's no way they properly did the balancing that was required, and they never considered alternatives. The Supreme Court makes clear that even if the underlying policy is illegal, which you would think would give strong interest in favor of withdrawing it, that doesn't preclude them from considering forbearance, which wasn't required here, or the alternative of actually providing the homeopathic-specific GRAS-E standard that they promised all along. The agency says it's barred by the statute now from doing that, even though for decades they said they had the authority and they promised to do it. By changing another policy, that can't solve the reliance interest that the Supreme Court sought to protect in Regents. All right. Thank you, Counsel. Madam Clerk, if you would call the next case.
judges: Henderson, Rogers, Wilkins